1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

CURTIS SHANE THOMPSON

9

                              Plaintiff,          Case No. C08-1065-TSZ-JPD

10

        v.

11

JOHN T. HICKS, *et al.*,                       REPORT AND RECOMMENDATION

12

                              Defendants.

13

14

INTRODUCTION AND SUMMARY CONCLUSION

15

        This is a civil rights action proceeding under 42 U.S.C. § 1983.  Plaintiff Curtis

16

Thompson is a state prisoner who is currently confined at the Clallam Bay Corrections Center in

17

Clallam Bay, Washington.  He filed this action while confined at the King County Correctional

18

Facility ("KCCF") in Seattle, Washington.  The lone claim remaining in this action is plaintiff's

19

claim that Benjamin Sanders, M.D., Medical Director of King County's Jail Health Services

20

("JHS"), was deliberately indifferent to plaintiff's serious medical condition while he was

21

confined at KCCF.

22

        Dr. Sanders has filed a motion for summary judgment seeking dismissal of plaintiff's

23

deliberate indifference claim.  Plaintiff as filed a response opposing defendant's summary

REPORT AND RECOMMENDATION - 1

judgment motion and defendant has filed a reply in support of his motion.[1]  Also pending before the Court at this time is plaintiff's motion for reconsideration of the Court's prior order denying plaintiff's motion to amend his complaint.  The Court, having reviewed the parties' pending motions, and the balance of the record, concludes that defendant's motion for summary judgment should be granted, plaintiff's motion for reconsideration should be denied, and plaintiff's third amended complaint and this action should be dismissed with prejudice.

BACKGROUND

Plaintiff Curtis Thompson was confined at KCCF between August 2004 and July 2009 while awaiting trial on criminal charges.  (Dkt. 159 at 2.)  Beginning in August 2007, and continuing through July 2008, plaintiff complained of various skin conditions for which he received treatment from JHS personnel.  (*See id*.)  On August 12, 2007, plaintiff complained at triage that he was breaking out with acne, that he had dandruff, and that the nails and skin on his hands were peeling.  (Dkt. 159 at 2 and Ex. 1 at 2.)  The nurse observed some pimples on plaintiff's face and back, noted that the skin on plaintiff's palm was peeling and that his nails were very thick and down to the middle of the nail bed, and referred plaintiff to the clinic.  (*Id*.)  Shortly thereafter, on August 16, 2007, plaintiff reported to JHS personnel that a medication he had been prescribed for anxiety was causing itching to his face and scalp, and a generalized body rash, and he refused to take the medication any longer.  (*See* Dkt. 159 at 2 and Ex. 1 at 3-5.)

Entries in plaintiff's medical records on August 22, 2007 and August 23, 2007 noted plaintiff's complaints of scalp lesions and a rash, and indicated that an appointment with a medical provider had been scheduled for August 28, 2007.  (*Id*., Ex. 1 at 6-7.)  Plaintiff was seen

---

[1]  Plaintiff identified his response as a cross-motion for summary judgment but because it was filed after the dispositive motion filing deadline had passed, the Court construes plaintiff's cross-motion as a response to defendant's motion for summary judgment rather than as a separate summary judgment motion.

REPORT AND RECOMMENDATION - 2

by A.R.N.P. Catherine Schroeder on August 28 to address his complaints concerning scalp lesions.  (Dkt. 159 at 2 and Ex. 1 at 9.)  Plaintiff reported that the sores on his scalp appeared a month prior after he shaved his hair short, and that they were not itchy but they did weep and crust-over.  (*Id.*)  Upon examination, A.R.N.P. Schroeder noted small crusted lesions on plaintiff's scalp, but no head lice, skin redness, or swelling.  (*See id.*)  She assessed plaintiff's condition as likely staphylococcal ("staph") dermatitis and prescribed a seven-day course of an antibiotic, Septra, which is used to treat infections caused by bacteria.  (*Id.* at 3 and Ex. 1 at 9, 11.)

Plaintiff demanded during his August 28, 2007 interaction with A.R.N.P. Schroeder that his finger nails be treated for a fungal infection and he became abusive when she explained that such treatment was not offered in jail.  (*Id.*, Ex. 1 at 9.)  Three days later, on August 31, 2007, plaintiff was seen in triage for complaints of fungal infection on his finger and toe nails, and for infection on his scalp.  (*Id.*, Ex. 1 at 13.)  It appears that the nurse who assessed plaintiff observed no signs of infection on plaintiff's scalp, but observed discolored/deformed finger and toe nails which she assessed as a probable fungal infection.  (*Id.*, Ex. 1 at 13-14.)  The nurse thereafter discussed plaintiff's nail problem with a provider who advised that fungal infections were not treated due to a risk of liver toxicity.  (*Id.*)  Plaintiff was instructed to notify medical staff if the nail areas became red or swollen.  (*Id.*)

On November 9, 2007, plaintiff was seen in triage for complaints of infections on his scalp and arms.  (*Id.*, Ex. 1 at 15.)  A JHS nurse examined plaintiff through his cell door and could not see any lesions, but she set up a medical appointment for plaintiff at his insistence.  (*Id.*, Ex. 1 at 15-16.)  On January 4, 2008, plaintiff was seen by A.R.N.P. Debra Beckman for evaluation of his complaint of scalp lesions which had first been treated the prior August, but

REPORT AND RECOMMENDATION - 3

which had not resolved.  (Dkt. 159, Ex. 1 at 17.)  Upon examination, A.R.N.P. Beckman noted that plaintiff was in no apparent distress and that he had small crusted lesions on his scalp.  (*Id.*) A.R.N.P. Beckman observed no swelling or thickening of the lesions, nor any nits, lice, or patches of baldness.  (*Id.*)  She assessed plaintiff's condition as an infected scalp rash and staph aureus, and she prescribed Doxycycline Hyclate, an antibiotic used to treat bacterial infections, and Selenium Sulfide ("Selsun"), a medication used on the scalp to control symptoms of dandruff and dermatitis.  (*Id.* at 3 and Ex. 1 at 17-21.)

On February 5, 2008, and again on February 17, 2008, plaintiff submitted medical kites indicating that he still had infections on his scalp, hands, feet and arms, and that the antibiotics had not cleared them up.  (*Id.*, Ex. 1 at 24-27.)  Plaintiff was seen in triage on February 17, 2008 at which time plaintiff complained to the nurse that the bacterial infection affecting his skin made it feel like he was being "eaten away."  (*Id.*, Ex. 1 at 28.)  A JHS nurse observed plaintiff through his cell door and was able to see only some red marks on plaintiff's skin.  (*Id.*)  The nurse referred plaintiff to a medical provider for evaluation of plaintiff's complaints of a skin infection.  (*Id.*, Ex. 1 at 28-29.)

On February 22, 2008, plaintiff was seen by Gordon Raskin, M.D., for his complaints of a recurrent rash on his arms and scalp.  (*Id.*, Ex. 1 at 30.)  Plaintiff reported to Dr. Raskin that he had had a similar rash 1 to 2 months prior which had responded to a second course of antibiotics, and he asked that the prescription for antibiotics be refilled.  (*Id.*)  Upon examination, Dr. Raskin noted that plaintiff had some yellowish crust on his scalp and pustular lesions on both arms that were not actively draining.  (*Id.*)  Dr. Raskin assessed plaintiff's condition as "Cellulitis/Abscesses – likely due to MRSA" and prescribed Selenium Sulfide and scheduled a follow-up appointment to re-check plaintiff's skin eruptions.  (*Id.*, Ex. 1 at 31-33.)

REPORT AND RECOMMENDATION - 4

Dr. Sanders subsequently reviewed Dr. Raskin's notes of his appointment with plaintiff and, on February 25, 2008, Dr. Sanders initiated a two-week course of the antibiotic Doxycycline to treat plaintiff's cellulitis.  (Dkt. 159, Ex. 1 at 35-38.)  Plaintiff had a follow-up appointment with Dr. Raskin on March 3, 2008, at which time he requested a cream for itchy round patches on his arms and itchy crusts on his scalp.  (*Id*., Ex. 1 at 40.)  Dr. Raskin questioned whether plaintiff could be developing a fungal infection because of repeat courses of antibiotics, and he prescribed a two-week course of Ketoconazole, an anti-fungal medication used to kill fungus growing on the skin.  (*See id*. at 4 and Ex. 1 at 41-46.)

On March 8, 2008, plaintiff submitted a medical kite stating that he needed to continue treatment with the antibacterial lotion, shampoo, and antibiotics until his skin problems healed. (*Id*., Ex. 1 at 47.)  Plaintiff was advised that prescriptions for the shampoo and cream had already been written, and that his course of antibiotics had been completed.  (*Id*.)  Plaintiff submitted another kite on March 11, 2008, stating that his skin problems had not resolved and asking why he wasn't being kept on antibiotics and cortisone cream.  (*Id*., Ex. 1 at 49.)  Plaintiff was seen in triage the following day and he stated at that time that he believed his scalp infection was from the barber's scissors and that antibiotics had previously worked to clear up such infections.  (*See id*., Ex. 1 at 51.)  The JHS nurse attempted to see the area on plaintiff's scalp that he was concerned about, but was unsuccessful.  (*Id*.)  She referred plaintiff to a medical provider for evaluation of the need for a different treatment for plaintiff's scalp irritation.  (*Id*.)

On March 19, 2008, plaintiff submitted another medical kite complaining that he still had an "internal bacterial infection (MRSA)" on his scalp, and that the "short treatments" he had been receiving were making the infection more resistant.  (*Id*., Ex. 1 at 54.)  Plaintiff also requested in his kite that he be given cortisone cream for the eczema on his arms.  (*Id*.)  Plaintiff

REPORT AND RECOMMENDATION - 5

was seen by Dr. Raskin on March 20, 2008 for a re-check of his dermatitis.  (Dkt. 159, Ex. 1 at 55.)  At that time, plaintiff had a "diffuse reddish rash" on both of his arms and he was complaining of ongoing scalp lesions.  (*Id*.)  Plaintiff was adamant that he needed an antibiotic to "kill the internal bacteria."  (*Id*.)  In his notes of the encounter with plaintiff, Dr. Raskin noted that when plaintiff was last seen, the rash on his arms was fading and improving slightly, but that it had become redder with raised, darker borders.  (*Id*.)  Dr. Raskin noted no obvious scalp lesions, scabbing or scaling.  (*Id*., Ex. 1 at 56.)  It appears that Dr. Raskin assessed plaintiff's condition as dermatophytosis (ringworm), seborrheic dermatitis, and/or staph aureus.  (*See id*., Ex. 1 at 56-60.)  Dr. Raskin renewed plaintiff's prescription for Ketoconazole, started him on Selenium Sulfide, and scheduled him for a follow-up appointment in two weeks.  (*See id*.)

On April 14, 2008, plaintiff was seen by A.R.N.P. Diane Edwards to follow-up on his arm rash.  (*Id*., Ex. 1 at 65.)  A.R.N.P. Edwards observed plaintiff through the pass-through because of security concerns, and noted a few dry, flaking lesions on plaintiff's scalp but no erythema or pustules.  (*Id*., Ex. 1 at 66.)  She also noted that plaintiff had some patches of raised scaling skin on his arms with some whitish scale, but no other pigment changes.  (*Id*.)  Plaintiff had no rash on his chest, abdomen, or back.  (*Id*.)  A.R.N.P. Edwards assessed plaintiff's condition as dermatitis and started him on Triamcinolone, a topical steroid, apparently because the previous anti-fungal cream had increased the itching without improving the rash.  (*Id*.)  A.R.N.P. Edwards determined that there was no indication at that time for the Ketoconazole shampoo, though she did not discontinue the prescription, and she also determined that there was no apparent indication for antibiotics despite plaintiff's insistence that antibiotics were necessary to treat "internal bacteria."  (*Id*., Ex. 1 at 66-68.)

REPORT AND RECOMMENDATION - 6

On June 19, 2008, plaintiff was seen by R.N. Cassandra Hermann on rounds in the administrative segregation unit. (Dkt. 159, Ex. 1 at 69.) Plaintiff reported at that time that he believed his MRSA was coming back on his neck. (*Id.*) The nurse noted that plaintiff had a scattered crusted pattern on the nape of his neck, but no open sores, discharge, redness, or swelling. (*Id.*) R.N. Hermann referred plaintiff to the clinic for further evaluation. (*Id.*)

On July 1, 2008, plaintiff was seen by Peter Gomatos, M.D., for evaluation of his complaints of "internal infection" on his neck and in his body. (*Id.*, Ex. 1 at 70.) Plaintiff reported to Dr. Gomatos that he had contracted MRSA a year previously from the prison barber, that he periodically developed small pimple-like lesions on his back and scalp, and that he believed the infection involved his nose. (*Id.*) Plaintiff reported no fever, chills, or large boils, and stated that he had never had lesions in his axilla (armpit) or groin. (*Id.*) He also reported that neither the anti-fungal cream nor the steroid cream had resulted in any improvement. (*Id.*)

Upon examination, Dr. Gomatos observed some small lesions on plaintiff's back, none of which were weeping, with only minimal surrounding redness. (*Id.*, Ex. 1 at 71.) Dr. Gomatos assessed plaintiff's condition as mild folliculitis (inflammation of hair follicles), likely staph, and advised plaintiff to keep the areas clean and dry. (*Id.*) Dr. Gomatos also took cultures for MRSA from two open lesions on plaintiff's back, and a separate culture from plaintiff's nose. (*Id.*) A follow-up appointment was scheduled to review the results of the cultures and consider the appropriate treatment. (*Id.*)

On July 14, 2008, A.R.N.P. Catherine Schroeder reviewed the laboratory results of the cultures taken by Dr. Gomatos. (*See id.*, Ex. 1 at 77-78.) The cultures grew only basic staphylococcal aureus, not MRSA, and A.R.N.P. Schroeder prescribed a 10 day course of Keflex, an antibiotic used to treat bacterial infections. (*See id.*, Ex. 1 at 72-73, 75-78.) A.R.N.P.

REPORT AND RECOMMENDATION - 7

Schroeder also requested that nursing check plaintiff's neck lesions to see if they had healed and indicated that if the lesions had healed, the Keflex would be discontinued.  (Dkt. 159, Ex. 1 at 77.)  The following day, R.N. Susan Embry evaluated plaintiff's lesions and noted multiple small red lesions over most of plaintiff's back, a few of which were scabbed.  (*Id.*, Ex. 1 at 79.)  She thereafter spoke with A.R.N.P. Schroeder about the appearance of the lesions and a decision was made to continue the Keflex.  (*Id.*)

Plaintiff's medical records appear to indicate that he continued to receive Triamcinolone and Ketoconazole to treat dermatitis and ringworm through September 2, 2008.  (*See* Dkt. 159 at 7 and Ex. 1 at 80, 81.)  Plaintiff apparently made no further complaints regarding skin conditions to JHS staff prior to his discharge from KCCF on July 17, 2009.  (*See id.*)

<u>PROCEDURAL HISTORY</u>

Plaintiff filed this civil rights action in July 2008 alleging that attorneys involved in his then pending criminal case had conspired to prevent him from conducting discovery and obtaining evidence and witnesses for his case, that he had been assaulted by guards at the King County Jail, and that medical staff at the King County Jail were deliberately indifferent to his medical needs after the alleged assaults.  (*See* Dkt. 5 at 3.)  Plaintiff was thereafter given multiple opportunities to amend his complaint in order to cure pleading deficiencies, and plaintiff filed three amended complaints.  (*See* Dkts. 6, 7, 9, 13, 16 and 17.)  Plaintiff's third amended complaint, filed January 15, 2009, is the operative complaint in this action.  (Dkt. 17.)

Prior to service of the third amended complaint, the Court dismissed from this action all claims and defendants except for plaintiff's claims of excessive force alleged against four King County Jail employees:  Sergeant Taylor, Sergeant Fasen, Corrections Officer Filipo, and Corrections Officer Clemons.  (Dkt. 19.)  The Court subsequently permitted plaintiff to amend

his complaint to add one more defendant implicated in plaintiff's excessive force claim, Sergeant Maude. (*See* Dkt. 27.)  Though plaintiff was permitted to amend, no new pleading was submitted and the operative complaint remained the third amended complaint filed in January 2009. (*See id*. at 2.)  The Court specifically noted in its Order granting plaintiff leave to amend to add Sergeant Maude that no further motions for leave to amend would be granted. (*Id*.)

The case proceeded to trial on plaintiff's excessive force claims in 2012 and, on August 2, 2012, a jury returned verdicts for the defendants. (*See* Dkts. 105 and 106.)  Plaintiff thereafter filed an appeal in the United States Court of Appeals for the Ninth Circuit challenging the Court's dismissal of several claims for failure to state a claim, and the Court's Order allowing evidence at trial of plaintiff's prior bad acts and prior convictions. (*See* Dkts. 120 and 136 at 1.)  The Ninth Circuit affirmed in part, and reversed and remanded in part. (*See* Dkt. 136.)  Specifically, the Ninth Circuit concluded that this Court should not have dismissed plaintiff's § 1983 claim for deliberate indifferent to serious medical conditions and therefore reinstated that claim, but affirmed in all other respects. (*Id*.)

The Ninth Circuit outlined plaintiff's deliberate indifference claim as follows:

Thompson's multiple complaints alleged that he sent many requests for medical care to jail staff over a two-year period to treat painful "infections on [his] head and backside" and "finger and toenails" and that had jail staff responded to those requests, his condition could have been treated with an antibiotic or over-the-counter medication.  Thompson also pled that B. Sanders, the jail's medical director, who presumably was responsible for triage, and other unknown John Does, were responsible for refusing to see and treat him.  Those facts were sufficient to state a claim under § 1983.

(Dkt. 136 at 2.)

The Ninth Circuit issued its mandate on October 29, 2014, and the matter was subsequently referred to the undersigned for further proceedings. (Dkts. 138 and 142.)  On

REPORT AND RECOMMENDATION - 9

1  December 1, 2014, this Court issued an Order directing service on Dr. Benjamin Sanders, the

2  only individual specifically identified in plaintiff's deliberate indifference claim. (Dkt. 143.)

3  Days later, the Court received from plaintiff a motion seeking leave to amend and other relief.

4  (Dkt. 144.) The Court denied the motion to amend because plaintiff failed to include with his

5  motion a proposed amended complaint. (Dkt. 145.)

6  On April 20, 2015, the Court received from plaintiff a motion seeking leave to

7  supplement/amend his claims and other relief. (Dkt. 153.) The Court denied that motion as well,

8  again on the grounds that plaintiff failed to submit in conjunction with his motion a proposed

9  amended complaint. (Dkt. 156.) On June 8, 2015, plaintiff filed a motion for reconsideration of

10  the Order denying his motion for leave to amend and the motion was placed on the Court's

11  calendar for consideration on June 26, 2015. (Dkt. 157.) On June 16, 2015, defendant Sanders

12  filed a motion for summary judgment and, on June 17, 2015, defendant filed a response to

13  plaintiff's motion for reconsideration. (Dkts. 158 and 162.) On July 1, 2015, plaintiff filed a

14  cross-motion for summary judgment which defendant requests be treated as a response to his

15  summary judgment motion rather than as a separate motion because it was filed after the June

16  18, 2015 dispositive motion filing deadline. (*See* Dkts. 163 and 164.) This request seems

17  appropriate and the Court has so construed plaintiff's cross-motion for summary judgment.

18  Plaintiff's motion for reconsideration and defendant's motion for summary judgment are

19  now ripe for review and are properly considered together in this Report and Recommendation.

20  <u>DISCUSSION</u>

21  <u>Motion for Summary Judgment</u>

22  Summary judgment is appropriate when, viewing the evidence in the light most favorable

23  to the nonmoving party, there exists "no genuine dispute as to any material fact" such that "the

REPORT AND RECOMMENDATION - 10

movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Material facts are facts which might affect the outcome of the pending action under governing law.  *See Anderson*, 477 U.S. at 248.  Genuine disputes are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

In response to a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the existence of the elements essential to his case.  *See* Fed. R. Civ. P. 56(e).  A mere scintilla of evidence is insufficient to create a factual dispute.  *See Anderson*, 477 U.S. at 252.  In ruling on a motion for summary judgment, the court may not weigh the evidence or make credibility determinations.  *Id*. at 248.

<u>Section 1983 Standard</u>

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law.  *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

REPORT AND RECOMMENDATION - 11

<u>Due Process:  Inadequate Medical Care</u>

The claim alleged by plaintiff in his third amended complaint, and reinstated by the Ninth Circuit, was that Dr. Sanders and other unknown members of the jail medical staff were deliberately indifferent to plaintiff's serious medical needs when they failed to respond to requests for medical care to treat painful skin infections which plaintiff identified as "MRSA," or to treat infections of his fingernails and toenails.  (Dkt. 17 at 4-5.  *See also*, Dkt. 136 at 2.)

Plaintiff maintains that there is an additional component to his deliberate indifferent claim; *i.e.*, that he was denied proper follow-up care for injuries sustained in an alleged assault in March 2008.[2]  Defendant argues that this claim was not included in the Ninth Circuit's remand and should not be considered.  While true that the Ninth Circuit did not expressly include this portion of plaintiff's deliberate indifference claim in its remand order, the Ninth Circuit did not expressly exclude the claim either.  Given the lack of clarity by the Circuit, and the fact that plaintiff, in his various pleadings, consistently included his allegation regarding the lack of follow-up care in his deliberate indifference claim, this Court will address the claim.

It appears that plaintiff was a pretrial detainee at KCCF at times relevant to his complaint and, thus, his claim of inadequate medical care arises under the Due Process Clause of the Fourteenth Amendment.  *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996).  The claim is nonetheless properly analyzed under Eighth Amendment standards.  *See id*.  In order to establish an Eighth Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a subjective component.  The Eighth Amendment standard requires proof that (1) the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation;

---

[2]  This alleged assault was the subject of plaintiff's excessive force claims which were rejected at trial.

REPORT AND RECOMMENDATION - 12

1  and (2) the prison official acted with a sufficiently culpable state of mind.  *Farmer v. Brennan*,

2  511 U.S. 825, 834 (1994).

3      The objective component of an Eighth Amendment claim is "contextual and responsive

4  to 'contemporary standards of decency.'"  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting

5  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  The state of mind requirement under the subjective

6  component of the Eighth Amendment standard has been defined as "deliberate indifference" to

7  an inmate's health or safety.  *Farmer*, 511 U.S. at 834.  Under the "deliberate indifference"

8  standard, a prison official cannot be found liable for denying an inmate humane conditions of

9  confinement unless the official knows of and disregards an excessive risk to inmate health or

10  safety.  *Id.* at 837.

11      The Ninth Circuit has explained that "[p]rison officials are deliberately indifferent to a

12  prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical

13  treatment."  *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal quotation marks

14  omitted).  "[A] serious medical need is present whenever the failure to treat a prisoner's

15  condition could result in further significant injury or the unnecessary and wanton infliction of

16  pain."  *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

17      It is well established that a mere difference of opinion concerning proper medical care is

18  not sufficient to establish deliberate indifference.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.

19  1996) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)).  In order to prevail on an

20  Eighth Amendment claim which involves choices between alternative courses of treatment, a

21  plaintiff must show "that the course of treatment the doctors chose was medically unacceptable

22  under the circumstances . . . and . . . that they chose this course in conscious disregard of an

23  excessive risk to plaintiff's health."  *Jackson*, 90 F.3d at 332 (citations omitted).

REPORT AND RECOMMENDATION - 13

Defendant argues in his motion for summary judgment that plaintiff's allegations of deliberate indifference have no support in the record.  This Court concurs.

### 1.  *Nail Fungus*

Plaintiff asserts in his third amended complaint that Dr. Sanders, and others, were deliberately indifferent to his serious medical needs when they failed to treat infections of his fingernails and toenails.  (*See* Dkt. 17 at 4-5.)  The record reflects that after plaintiff brought his concern regarding the condition of his nails to the attention of JHS staff in August 2007, he was assessed with a probable fungal infection of his fingernails and toenails and the decision was made not to treat the infection but, rather, to monitor the nails for acute infection.  (*See* Dkt. 159, Ex. 1 at 2, 9, 13-14.)  Dr. Sanders, in his declaration in support of his motion for summary judgment, explains that fungal infections of the nails are generally cosmetic, do not spread, and have no ill effects.  (Dkt. 159 at 3.)  Moreover, the medications used to treat such infections can be toxic to the liver and, thus, treatment for the condition is typically deferred absent signs of acute infection.  (*See id*. and Ex. 1 at 13-14.)

Plaintiff fails to demonstrate that the fungal infection of his nails constituted a serious medical need or that defendant was, in any event, deliberately indifferent to the condition. Plaintiff's complaint regarding the failure of defendant to treat his fungal infection constitutes, at most, a difference of opinion as to the proper course of treatment and there is no evidence in the record that the course of treatment chosen was medically unacceptable.  Accordingly, this portion of plaintiff's deliberate indifference claim fails.

### 2.  *Skin Infections*

Plaintiff also asserts in his third amended complaint that Dr. Sanders, and others, were deliberately indifferent to his serious medical needs when they failed to treat "infections on [his]

REPORT AND RECOMMENDATION - 14

head & backside (MRSA)."  (*See* Dkt. 17 at 4-5.)  Plaintiff contends that these infections could have been treated with antibiotics or over-the-counter medications, but defendant failed to act. (*See id.*)  Faced with the evidence submitted by defendant in support of his motion for summary judgment which demonstrates that members of the JHS staff did, in fact, respond to plaintiff's complaints regarding his skin infections, and repeatedly prescribed antibiotics and other medications to treat those conditions, plaintiff now acknowledges that he received treatment for his skin infections, but he maintains that the various treatments provided by JHS staff were not effective and that he eventually gave up pursing treatment while at KCCF.  (*See* Dkt. 163 at 2-3.)

The medical records provided by defendant in support of his summary judgment motion demonstrate that members of the JHS staff were generally responsive to plaintiff's complaints regarding his skin infections.  Though there is no evidence in the record that JHS staff ever refused to see or treat plaintiff, it appears that the ability of JHS staff to assess plaintiff's condition may have been limited on occasion by the fact that plaintiff was an ultra-security inmate and such assessments had to be conducted through the cell door.  This limitation appears to have resulted, on at least one occasion, in a delay in plaintiff receiving treatment.

Specifically, the medical records reflect that on November 9, 2007, plaintiff complained to a triage nurse of infections on his scalp and arms.  (Dkt. 159, Ex. 1 at 15.)  Plaintiff was seen through his cell door and the nurse reported seeing no lesions and conducting no other examination.  (*Id.*)  The nurse set up a medical clinic visit for plaintiff, but apparently only because he insisted that she do so.  (*See id.*)  The nurse assigned a low priority to the follow-up appointment and plaintiff was not seen in the clinic until January 4, 2008.  (*See id.*, Ex. 1 at 15-17.)

REPORT AND RECOMMENDATION - 15

1    At the January 4, 2008 appointment, plaintiff complained of scalp lesions which had not

2    resolved since being treated with an antibiotic in August 2007.  (Dkt. 159, Ex. 1 at 17.)  Plaintiff

3    was diagnosed with staph aureus and was prescribed a two week course of oral antibiotics and a

4    topical anti-infective medication for his scalp.  (*See id*., Ex. 1 at 17-21.)  While the delay in

5    providing treatment on this occasion is concerning, there is no evidence in the record that the

6    delay caused plaintiff any significant injury or unnecessary pain and, thus, the delay does not rise

7    to the level of a constitutional violation.

8        Another notable delay, which plaintiff references in his response to defendant's summary

9    judgment motion, was the delay in JHS staff performing a diagnostic culture of plaintiff's skin

10   infection.  There is insufficient information in the record for this Court to assess the exact point

11   at which such testing might have been necessary and/or appropriate.  However, the Court finds it

12   noteworthy that Dr. Raskin, on February 22, 2008, assessed plaintiff with "Cellulitis/Abscesses –

13   likely due to MRSA," and yet ordered no diagnostic cultures and prescribed nothing but a topical

14   anti-infective even though plaintiff reported to him that oral antibiotics had previously been

15   effective.  (*Id*., Ex. 1 at 30-34.)

16       Dr. Sanders subsequently reviewed Dr. Raskin's assessment, presumably in his role as

17   medical director, and prescribed a 10 day course of oral antibiotics beginning on February 25,

18   2008.  (*Id*., Ex. 1 at 36-38.)  Dr. Sanders did not order any diagnostic cultures, but nothing in the

19   record suggests that the failure to perform diagnostic cultures at that time resulted in any harm to

20   plaintiff.  And, in fact, when Dr. Gamatos finally took cultures in July 2008 to test for MRSA, no

21   MRSA was detected.  (*Id*., Ex. 1 at 70-73, 77.)  This fact reinforces the conclusion that the

22   failure to conduct diagnostic testing earlier in the treatment process did not result in any

23   significant harm.

REPORT AND RECOMMENDATION - 16

Overall, though there were some questionable delays in providing plaintiff treatment, the evidence submitted by defendant in support of his summary judgment motion demonstrates that defendant and the JHS staff responded to plaintiff's concerns about his skin infections and provided him necessary and appropriate treatment.[3]  Plaintiff offers no evidence to the contrary. Defendant is therefore entitled to judgment as a matter of law with respect to plaintiff's claim that he was deliberately indifferent to plaintiff's skin infections.[4]

### 3.      *Follow-Up Care for Injuries*

Finally, plaintiff asserts in his third amended complaint that Dr. Sanders, and others, were deliberately indifferent to his serious medical needs when they failed to provide follow-up care for injuries sustained in an altercation with corrections officers in March 2008.  (Dkt. 17 at 4-5.) The record reflects that the altercation with corrections officers occurred on March 13, 2008 during which plaintiff hit his head and suffered a two inch laceration to the right side of his scalp.  (*See* Dkt. 165, Ex. 1 at 1.)  Plaintiff was evaluated by R.N. Carolyn Michels, who dressed plaintiff's wound, and plaintiff was then transported to Harborview Medical Center ("HMC") for further evaluation and treatment.  (*See id.*)

At HMC, plaintiff was diagnosed with a scalp laceration and a fracture of the zygomatic arch.  (*Id.*, Ex. 1 at 2-3.)  The laceration was repaired using staples and plaintiff was prescribed

---

[3]  Plaintiff asserts in his response to defendant's summary judgment motion that he was never given the oral antibiotic Keflex which was prescribed for him in July 2008 after the diagnostic cultures confirmed that plaintiff was then suffering from a staph infection.  (*See* Dkt. 163 at 2-3.)  However, there is no evidence in the record to support this assertion.  The medical records provided by defendant in support of his motion for summary judgment demonstrate that plaintiff received a 10 day course of the antibiotic with instructions that the medication be kept on plaintiff's person and be self-administered four times per day.  (*See* Dkt. 159, Ex. 1 at 75-79.)  Plaintiff's conclusory assertion that he didn't receive the drug is insufficient to preclude summary judgment.

[4]  Plaintiff asks the Court to consider in support of his deliberate indifference claim a November 2007 Department of Justice ("DOJ") report which found that the medical care provided at KCCF fell below the constitutionally required standard of care due to "inadequate prevention and treatment of communicable diseases, particularly skin infections and MRSA."  (*See* Dkt. 81 at 22.)  While the Court identified in plaintiff's medical record issues of concern similar to some of those raised in the DOJ report, the report simply does not establish that the care provided to *plaintiff* was constitutionally inadequate.

REPORT AND RECOMMENDATION - 17

1   ibuprofen and acetaminophen for pain.  (Dkt. 165, Ex. 1 at 4-5.)  The treatment plan detailed by

2   HMC included follow-up appointments with the craniofacial/burns/plastics and ophthalmology

3   clinics, removal of the staples in 7-10 days, and daily dressing changes including application of

4   antibacterial ointment.  (*Id*., Ex. 1 at 4.)

5        On March 14, 2008, Dr. Sanders reviewed the HMC Emergency Room record of

6   plaintiff's visit and noted the diagnosis provided by HMC.  (Dkt. 159, Ex. 1 at 52.)  He further

7   noted that transport slips had been completed for plaintiff's follow-up visits at the HMC specialty

8   clinics, that medications had been prescribed for pain, and that the staples would need to be

9   removed in 7 to 10 days.  (*Id*., Ex. 1 at 52-53.)

10      On March 21, 2008, Dr. Sanders reviewed information that he had received from the

11   outside appointment scheduler who advised that plaintiff had refused to go to the plastic surgery

12   appointment scheduled for that day.  (Dkt. 165, Ex. 1 at 7.)  Dr. Sanders noted that plaintiff had

13   been "functionally intact" since returning from HMC and that a "signed informed refusal" to

14   attend the appointment had been obtained.  (*Id*.)  He concluded that there was no acute need for

15   further evaluation and that plaintiff could submit a kite "for follow-up or for symptoms."  (*Id*.)

16      On March 22, 2008, plaintiff was seen by JHS R.N. Heidi Zanker for removal of his

17   staples.  (Dkt. 159, Ex. 1 at 61.)  R.N. Zanker removed the staples but then noted that the wound

18   appeared not to be closed enough.  (*Id*.)  She further noted that plaintiff would be re-checked the

19   next day though there is no indication in plaintiff's medical records that this follow-up occurred.

20   (*See id*.)

21      A note in plaintiff's medical records on March 24, 2008, reveals that plaintiff refused to

22   go to his follow-up appointment at the HMC ophthalmology clinic, just as he had previously

23   refused to attend his follow-up appointment at the HMC plastic surgery clinic.  (Dkt. 159, Ex. 1

at 62.)  Plaintiff was apparently then scheduled for a follow-up appointment with a JHS medical provider to discuss his refusal to attend his HMC appointments.  (Dkt. 159, Ex. 1 at 62.)  On April 2, 2008, A.R.N.P. Beckman contacted plaintiff to inquire about his refusal to go to his HMC appointments, and plaintiff advised that he was not refusing to go to HMC, he was only refusing to be taken by the guards whom he claimed caused his injuries.  (Dkt. 165, Ex. 1 at 6.) A.R.N.P. Beckman explained to plaintiff that she was unable to arrange any alternate form of transportation for his HMC appointment and she advised that he go to his appointment when called.  (*Id.*)  A.R.N.P. Beckman noted that she would seek Dr. Sanders' advice regarding plaintiff's lack of follow-up at the ophthalmology and plastic surgery clinics.  (*Id.*)  There is no indication in plaintiff's medical records whether Dr. Sanders ever responded to A.R.N.P. Beckman's request for follow-up advice.

The medical records submitted by defendant in support of his summary judgment motion suggest that there may have been some gaps in the follow-up care plaintiff received for the injuries suffered on March 13, 2008, some attributable to JHS staff and some attributable to plaintiff himself.  For example, nothing in the record indicates that JHS staff changed plaintiff's wound dressing daily, and applied antibacterial ointment, as recommended by the HMC provider.  However, the lack of follow-up at the HMC specialty clinics, which appears to be plaintiff's primary complaint, was a direct result of plaintiff's refusal to attend those appointments.  While plaintiff suggests that his refusal to return to HMC was warranted because of his fear of being assaulted, nothing in the record suggests that this fear was justified.  And,

REPORT AND RECOMMENDATION - 19

1    regardless of the apparent gaps in plaintiff's follow-up care, or the reasons for those gaps, there is

2    no evidence in the record demonstrating that plaintiff suffered any additional harm as a result.[5]

3        In sum, plaintiff fails to demonstrate that any deficiencies in the follow-up treatment for

4    his facial injuries violated constitutional standards.  Accordingly, Dr. Sanders is entitled to

5    judgment as a matter of law with respect to this final portion of plaintiff's deliberate indifference

6    claim as well.

7                                    Motion for Reconsideration

8        On May 26, 2015, this Court denied plaintiff's most recent motion to amend his

9    complaint on the grounds that plaintiff failed to submit with his motion a proposed amended

10   complaint.  (Dkt. 156.)  Plaintiff moves for reconsideration of this ruling, arguing that the Court

11   misread or misunderstood his motion papers because he did, in fact, submit a proposed

12   supplemental pleading with his motion.  (Dkt. 157.)

13       Motions for reconsideration are disfavored and will be granted only in limited

14   circumstances.  The Court will ordinarily deny motions for reconsideration "in the absence of a

15   showing of manifest error in the prior ruling or a showing of new facts or legal authority which

16   could not have been brought to its attention earlier with reasonable diligence."  LCR 7(h)(1).

17       A review of plaintiff's April 17, 2015 motion papers confirms that plaintiff did submit

18   with his motion for leave to amend a document entitled "Proposed Supplemental –Amended

19   Pleadings." (Dkt. 157-1.)  While the proposed amended pleading was not presented in the

20   preferred format, it was arguably sufficient to warrant more substantive review.  Accordingly,

21   this Court's basis for denying plaintiff's motion to amend was arguably incorrect.  However, a

22

23       _____

         [5]  The Court notes that during the period of time when plaintiff was recovering from his facial injuries, it
     appears that he actively sought treatment for his skin infections, but did not actively pursue any follow-up treatment
     for his facial injuries.

REPORT AND RECOMMENDATION - 20

substantive review of plaintiff's proposed amended pleading satisfies this Court that denial of plaintiff's motion to amend is still appropriate for reasons that will be discussed below.

Rule 15(a) of the Federal Rules of Civil Procedure provides that the court should freely give leave to amend "when justice so requires."  Five factors are typically considered when assessing the propriety of a motion for leave to amend:  (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended his complaint.  *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).

Plaintiff, by way of his proposed supplemental/amended pleading, seeks to expand his deliberate indifference claim to include claims against King County, former jail director Reed Holtgeerts, and Dr. Sanders for knowingly permitting unsafe and unhealthy conditions of confinement at the King County Jail resulting in the transmission of MRSA and fungal infections.  (Dkt. 153-1)  He also seeks to add claims against King County and former director Holtgeerts for the alleged failure of the medical staff to treat those infections.  (*Id.*)  Plaintiff contends that the "custom or policy" of unsafe and/or unhealthy conditions of confinement, and the failure to provide treatment for infections arising out of those conditions, continues to affect inmates at the King County Jail and the Regional Justice Center and he seeks an injunction from this Court to ensure the jail facilities remain compliant with federal constitutional standards.  (*Id.*)

The Ninth Circuit remanded this case for consideration of a specific previously dismissed claim; *i.e.*, plaintiff's claim that Dr. Sanders and other JHS personnel were deliberately indifferent to his serious medical needs.  (*See* Dkt. 136 at 2.)  Plaintiff should not be permitted to take advantage of this remand to litigate new claims which, through the exercise of reasonable diligence, could have been asserted much earlier in this action.  This is particularly so given that

REPORT AND RECOMMENDATION - 21

plaintiff was provided multiple opportunities in the early stages of this case to amend his complaint and was advised several years ago that no further motions to amend would be granted. (*See* Dkt. 27.)  Plaintiff had ample opportunity to assert claims regarding the conditions of his confinement at the outset of this action.  It is many years too late for plaintiff to assert entirely new causes of action.

With respect to the claims asserted in his proposed amended complaint which arguably fall within the ambit of his deliberate indifference to medical care claim, plaintiff has simply not alleged sufficient facts to state a cause of action against former jail director Reed Holtgeerts or against King County arising out of the alleged deficiencies in the medical care provided plaintiff at KCCF.  Moreover, because the evidence supplied to the Court in support of Dr. Sanders' summary judgment motion demonstrates no violation of plaintiff's federal constitutional rights relative to the medical care he received while confined at the King County Jail, it would serve no purpose to permit him to amend his complaint to assert the same claims against new defendants. For the foregoing reasons, plaintiff's motion for reconsideration of the Court's prior order denying him leave to amend his complaint should be denied.

<u>CONCLUSION</u>

As plaintiff has not established any violation of his federal constitutional rights, this Court recommends that defendant's motion for summary judgment be granted, and that plaintiff's third amended complaint and this action be dismissed with prejudice.  This Court further recommends that plaintiff's motion for reconsideration be denied as well.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **September 2, 2015**.  Failure to file objections

REPORT AND RECOMMENDATION - 22

within the specified time may affect your right to appeal.  Objections should be noted for

consideration on the District Judge's motion calendar for the third Friday after they are filed.

Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no

timely objections are filed, the matter will be ready for consideration by the District Judge on

**September 4, 2015.**

       This Report and Recommendation is not an appealable order.  Thus, a notice of appeal

seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

assigned District Judge acts on this Report and Recommendation.

       DATED this <u>12th</u> day of August, 2015.

_James P. Donohue_
_____
JAMES P. DONOHUE
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 23